STATE v. ORANGE & N. W. RY. CO. et al.*
(No. 5528.)

(Court of Civil Appeals of Texas. Austin.
Oct. 28, 1915. Rehearing Denied
Dec. 22, 1915.)

COMMERCE ⬤⟿8 — INTERSTATE COMMERCE —
LAWS—SCOPE.

The Safety Appliance Act (Act Cong. March 2, 1893, c. 196, 27 Stat. 531, as amended by Act Cong. March 2, 1903, c. 976, 32 Stat. 943), which relates to safety appliances for railroads engaged in interstate commerce, and fixes the appliances which shall be used on cars, declares in section 6 that trains composed of four-wheel and eight-wheel standard logging cars, the height of which does not exceed 25 inches, need not be equipped with automatic couplers. *Held* that, as to a railroad engaged in interstate commerce, the federal regulations supersede the state laws relating to safety appliances on logging cars, even though such cars are used exclusively in intrastate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. ⬤⟿8.]

Appeal from District Court, Travis County; George Calhoun, Judge.

Action by the State of Texas against the Orange & Northwestern Railway Company and another. From a judgment for defendants, plaintiff appeals. Affirmed.

The state brought this suit against the Orange & Northwestern Railway Company and Frank Andrews, the receiver in possession of and operating the railroad belonging to that company. The cause of action asserted arose out of alleged violations of what is known as the state Safety Appliance Law, enacted by the Legislature of this state in 1909. There was a nonjury trial, which resulted in a judgment for the defendants, and the state has appealed. The evidence supports the trial judge's findings of fact, and we adopt the same, which are as follows:

"(1) That the defendant Orange & Northwestern Railway Company is a railway corporation organized and doing business under and by virtue of a charter issued by the state of Texas and under the laws of the state of Texas, and owning a line of railway in part extending from and between the towns of Bessmay, Tex., and Newton, Tex.

"(2) That on the 9th day of July, 1913, Frank Andrews was duly appointed as receiver of the defendant Orange & Northwestern Railway Company, and has qualified and acted as such receiver since said date.

"(3) That on or about the 17th of November, 1913, defendant company's train No. 335 contained cars which were not equipped with couplers coupling automatically by impact and which could be coupled and uncoupled without the necessity of men going between the ends thereof, because the coupling apparatus with which said cars were equipped was of such a nature and in such defective condition as not to come within the requirements of the provisions of section 2 of the act of the Legislature of Texas, being chapter 26 of the Acts of the Regular Session of the Thirty-First Legislature (Vernon's Sayles' Ann. Civ. St. 1914, arts. 2849a–2849o).

"(4) That on the 17th and 19th days of November, 1913, defendants' trains Nos. 333 and 310 were not operated with power or train brakes to be used or operated or that could be used or operated by the engineers of said trains, and that less than 75 per centum of the cars in said trains were not equipped with power or train brakes, as required by section 1 of the Legislature of Texas, chapter 26, of the Acts of the Regular Session of the Thirty-First Legislature.

"(5) It was admitted by the plaintiff, and the court concludes as a fact, that on said 17th and 19th days of November, 1913, the defendants, the Orange & Northwestern Railway Company and the said Frank Andrews, receiver, were engaged in interstate commerce.

"(6) That prior to the 9th day of July, 1913, said defendant company, and thereafter said receiver, published and filed with the Interstate Commerce Commission tariffs, rules, and regulations, and concurrences in the tariffs, rules, and regulations so filed and published by other carriers governing and applying to fixing and establishing the rates, fares, and charges for the handling, carriage, and transportation of interstate commerce.

"(7) That the hauling, carriage, and transportation, of all such traffic and commerce was done and performed by said defendant company and by said receiver on and prior to said 17th and 19th days of November, 1913, and ever since said dates, in accordance with the tariffs, rules, and regulations so filed and published and concurred in by the defendants, and that the rates, fares and charges demanded and collected by said defendants for the hauling, carriage, and transportation of such traffic on and prior to said 9th day of July, 1913, and on the 17th and 19th days of November, 1913, were the rates, fares, and charges so fixed and established, and that on all of said dates said defendant company and its said receiver were common carriers by railroad and engaged in interstate commerce.

"(8) That on the dates hereinbefore referred to a large portion of the cars in the trains complained of by plaintiff in this suit were standard skeleton logging cars, used solely for the carriage and transportation of logs from the woods or from points on the line of the carriers near the woods to the mills, and that in the equipment of said cars said defendant company complied with the rules and regulations of the Interstate Commerce Commission with regard to logging cars."

B. F. Looney, Atty. Gen., and Luther Nickels, Asst. Atty. Gen., for the State. Andrews, Streetman, Burns & Logue, Sam Streetman, and Robt. H. Kelley, all of Houston, for appellees.

KEY, C. J. (after stating the facts as above). By the acts of March 2, 1893, and March 2, 1903, the federal Congress enacted a law covering and regulating the subject of safety appliances for all common carriers engaged in interstate commerce by railroads, and by the amendment of March 2, 1903, it is declared that:

"The provisions and requirements hereof and of said acts relating to train brakes, automatic couplers, grabirons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the territories and the District of Columbia, and all other locomotives, tenders, cars, and similar vehicles used in connection therewith, excepting those trains, cars, and locomotives exempted by the provisions of section 6 of said act of March 2nd, 1893, as amended by the act of April 1st, 1896, or which are used upon street railways." 32 Stat. 943.

---

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.

Section 6, referred to in that quotation, exempts from the operation of the statute trains composed of four-wheeled and trains composed of eight-wheeled standard logging cars, where the height of such cars from top of rail to center of coupling does not exceed 25 inches. The facts show that appellees were common carriers by railroad, engaged in interstate commerce, and therefore it is contended by their counsel that, although the particular cars in question in this case were not used in handling interstate commerce, nevertheless, as they belonged to common carriers by railroad engaged in interstate commerce, the acts of Congress referred to supersede and nullify the Texas statute upon the same subject in so far as it is sought to enforce that statute in this case. That contention seems to be supported by decisions of the Supreme Court of the United States, which decisions constitute the controlling law upon the subject. Southern Ry. Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72; Northern Pacific Ry. Co. v. Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237; Erie R. R. Co. v. New York, 233 U. S. 671, 34 Sup. Ct. 756, 58 L. Ed. 1149, 52 L. R. A. (N. S.) 266, Ann. Cas. 1915D, 138; M., K. & T. Ry. Co. of Texas v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377; Atlantic Coast Line R. R. Co. v. Georgia, 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312; H. E. & W. T. Ry. Co. v. United States, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341; Southern Ry. Co. v. Reid, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257; C., R. I. & P. Ry. Co. v. Hardwick Farmers' Elevator Co., 226 U. S. 426, 33 Sup. Ct. 174, 57 L. Ed. 284, 46 L. R. A. (N. S.) 203; State v. T. & N. O. R. R. Co., 124 S. W. 984. See, also, Southern Railway Co. v. Railroad Commission of Indiana, 236 U. S. 439, 35 Sup. Ct. 304, 59 L. Ed. 661, decided by the Supreme Court of the United States February 23, 1915. The last case seems to be directly in point, and we quote as follows from the opinion therein by Mr. Justice Lamar:

"The Indiana statute requires railway companies to place secure grabirons and handholds on the sides or ends of every railroad car under a penalty of $100 fine to be recovered in a civil action.

"In March, 1910, the Railroad Commission of the state brought such a suit against the Southern Railway Company, alleging that the company on February 24, 1910, had transported from Boonville, Ind., to Milltown, Ind., a car which did not have the required equipment. The defendant filed an answer in which it denied liability under the state law, inasmuch as on February 24, 1910, the federal Safety Appliance Act imposed penalties for failing to equip cars with handholds, and also designated the court in which they might be recovered. The commission's demurrer to the answer was sustained. The defendant refusing to plead further, judgment was entered against the company. That judgment was affirmed by the state court, and the case was brought here by writ of error.

"The car alleged to have been without the required equipment, though transporting freight between points wholly within the state of Indiana, was moving on a railroad engaged in interstate commerce, and the company was therefore subject to the provisions and penalties of the Safety Appliance Act (27 Stat. 531, par. 4). United States v. Southern Ry. Co., 222 U. S. 20 [32 Sup. Ct. 2, 56 L. Ed. 72].

"The defendant in error insists, however, that the railroad company was also liable for the penalty imposed by the Indiana statute. In support of this position numerous cases are cited which, like Cross v. North Carolina, 132 U. S. 131 [10 Sup. Ct. 47, 33 L. Ed. 287], hold that the same act may constitute a criminal offense against two sovereignties, and that punishment by one does not prevent punishment by the other. That doctrine is thoroughly established. But, upon an analysis of the principle on which it is founded, it will be found to relate only to cases where the act sought to be punished is one over which both sovereignties have jurisdiction. This concurrent jurisdiction may be either because the nature of the act is such that at the same time it produces effects respectively within the sphere of state and federal regulation, and thus violates the laws of both, or, where there is this double effect in a matter of which one can exercise control, but an authoritative declaration that the paramount jurisdiction of one shall not exclude that of the other. Compare R. S. § 711; 37 Stat. 670.

"But the principle that the offender may for one act be prosecuted in two jurisdictions has no application where one of the governments has exclusive jurisdiction of the subject-matter, and therefore the exclusive power to punish. Such is the case here, where Congress, in the exercise of its power to regulate interstate commerce, has legislated as to the appliances with which certain instrumentalities of that commerce must be furnished in order to secure the safety of employés. Until Congress entered that field the states could legislate as to equipment in such manner as to incidentally effect without burdening interstate commerce. But Congress could pass the Safety Appliance Act only because of the fact that the equipment of cars moving on interstate roads was a regulation of interstate commerce. Under the Constitution the nature of that power is such that, when exercised, it is exclusive, and ipso facto supersedes existing state legislation on the same subject. Congress, of course, could have 'circumscribed its regulations' so as to occupy a limited field. Savage v. Jones, 225 U. S. 502, 533 [32 Sup. Ct. 715, 56 L. Ed. 1182]; Atlantic Coast Line v. Georgia, 234 U. S. 280, 293 [34 Sup. Ct. 829, 58 L. Ed. 1341]. But, so far as it did legislate, the exclusive effect of the Safety Appliance Act did not relate merely to details of the statute and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employés. The states thereafter could not legislate so as to require greater or less or different equipment; nor could they punish by imposing a greater or less or different penalties; for, as said in Prigg v. Commonwealth of Pennsylvania, 16 Pet. 618 [10 L. Ed. 1060]: 'If Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner and in a certain form, it cannot be that the state Legislatures have a right to interfere, and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations and what they may deem auxiliary provisions for the same purpose. In such a case the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any further legislation to act upon the subject-matter. Its silence as to what it does not do is as expressive of what its intention is as the direct provisions made by it. * * * The will of Congress upon the whole subject is as clearly established by what it had not declared as by what it has expressed.'

"Without, therefore, discussing the many cas-

es sustaining the right of the states to legislate on subjects which, while not burdening, may yet incidentally affect interstate commerce, it is sufficient here to say that Congress has so far occupied the field of legislation relating to the equipment of freight cars with safety appliances as to supersede existing and prevent further legislation on that subject. The principle is too well established to require argument. Its application may be seen in rulings in the closely analogous cases relating to state penalties for failing to furnish cars and to state penalties for retaining employés at work on cars beyond the time allowed by the Hours of Service Law.

"In Hampton v. St. L., I. M. & S. Ry., 227 U. S. 456 [33 Sup. Ct. 263, 57 L. Ed. 596], it was held that the Arkansas statute imposing a penalty for failing to deliver cars had been superseded by the provisions of the Hepburn Act, although the provisions of the two statutes were not identical. In Northern Pacific Ry. Co. v. Washington, 222 U. S. 371 [32 Sup. Ct. 160, 56 L. Ed. 237], it was held that congressional legislation as to hours of service so completely occupied the field as to prevent state legislation on that subject. In Erie R. R. v. New York, 233 U. S. 671 [34 Sup. Ct. 756, 58 L. Ed. 1149, 52 L. R. A. (N. S.) 266, Ann. Cas. 1915D, 138], a like ruling was made in a case where the New York law punished a railroad company for allowing an employé to work more than eight hours when the federal statute punished the company for employing him for more than nine hours, even though it was argued that the state legislation was not in conflict with the federal act, but rather in aid of it. The same contention is made here, inasmuch as the Indiana law requires handholds on sides or ends of cars, while the federal statute requires handholds to be placed both on the sides and ends of cars.

"The test, however, is not whether the state legislation is in conflict with the details of the federal law or supplements it, but whether the state had any jurisdiction of a subject over which Congress had exercised its exclusive control. The Safety Appliance Act having superseded the Indiana statute, the judgment imposing the penalty must be reversed, and the case remanded for further proceedings not inconsistent with this opinion."

In Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, the federal government sought and recovered penalties because the railway company had failed to comply with the federal statute, and the defense urged was that the cars, which were not equipped as required by the federal statute, though owned by and constituting part of the equipment of a railroad engaged in interstate traffic, were at the time there involved hauling intrastate, and not interstate, traffic. The court held that while the original act was limited to rolling stock being at the time used in the transportation of interstate commerce, the amendment of March 2, 1903, enlarged the scope of the act, and made it apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, although such rolling stock might not be in use in the transportation of interstate commerce, and the court concluded its discussion of that subject in these words:

"For these reasons it must be held that the original act, as enlarged by the amendatory one, is intended to embrace all locomotives, cars, and similar vehicles used on any railroad which is a highway of interstate commerce."

It was also contended in that case that, if the federal statute undertook to prescribe safety appliances to be used on the cars and other vehicles belonging to interstate carriers, but used for intrastate, and not interstate, traffic, it exceeded the power conferred upon Congress by the federal Constitution for the purpose of regulating interstate commerce. The Supreme Court overruled that contention, and held that the statute was free from constitutional objections.

No reversible error has been shown, and the judgment is affirmed.

Affirmed.